Secretary, United States Department of Health and Human Services, and his official capacity as appellant to the state of Arkansas. Case number 19-1595 et al., Ronnie Maurice Stewart et al. v. Alex Michael Azar, II, and his official capacity as Secretary of the United States Department of Health and Human Services et al. v. Appellants, Commonwealth of Kentucky Ex-Reel, Matthew G. Devin, Governor. Ms. Klein for the federal appellants, Mr. Gershengorn for the appellees. Good morning, Ms. Klein. Good morning. May it please the Court. Alisa Klein for the federal government. A number of states that have chosen to provide substantial amounts of optional Medicaid coverage are testing various ways to try to make their Medicaid programs more cost-effective. And the mechanism that has been the principal focus of these cases tests out work-oriented requirements that are modeled on those in the existing federal TANF and SNAP food assistance programs in order to see if the application of those requirements helps to transition Medicaid recipients from the Medicaid program into commercial coverage. And it's particularly important to emphasize that that commercial coverage would not be limited to employer-based insurance, but also would include the heavily subsidized exchange insurance. Is that what they're trying to test, whether it transitions people to commercial coverage? Because I thought that was sort of a little not the central objective, that the central premise was that whether you earn money or get a better job that comes with coverage, that doing the work is healthy. That doing volunteer work, that doing training, that doing even a job that carries no commercial insurance is correlated with health, and therefore there isn't data in the record about people getting a leg up into a market through a work requirement and eventually how many of them get commercial insurance. I didn't see that as part of the record. Well, let me unpack the various questions. So both are true. It is unquestionably true that part of the hypotheses being tested are for existing Medicaid recipients, you know, these are primarily expansion adults, while in the Medicaid program, whether you will see improved health in part as a result of these work-oriented requirements and also other aspects of these demonstrations that are meant to increase preventive health services uptake, which is very low among the expansion population. So that is definitely a piece of it, but in the record, for example, the Kentucky application in July 2017, Kentucky made various modifications, and in the public notice that it put out to the objectives of the project, it included transitioning adults who can graduate from Medicaid into the exchanges and other commercial coverage. I have only one question for each side, and it's one that I would have thought should be simple, and maybe I'm overlooking something. But that is, in the case of each of these states, the requirements that have been placed on the new recipients are in a program that has two populations, the ones who are already covered, that is, they're already recipients of Medicaid, the ones who are coming in under the modified plan that the department is accepting for the individual states. The question I have is, do these restrictions that are placed in the accepted exploratory programs apply to both populations, that is to say, the existing recipients and the new recipients, or only to the new recipients? So the requirements for both Kentucky and Arkansas apply to the expansion population, but whether or not they were being covered before these demonstrations were approved, and in Kentucky also to a sliver. So it's not just people who for the first time are, if I'm answering the court's question. I falsely, yeah, that's what I, I falsely claim that I have only one question, but that leads me to another one. Given their application to perhaps some of the existing populations, is the government correct that the new programs do not expand the coverage of the ACA program, the Medicaid program? I'm not sure I'm understanding that. Perhaps I can step back. It seems to be taken by the government. I'm not nearly as simple as I thought I'd be. Okay. It seems to be taken by the government is this is not furthering the objectives of the Act. Oh, by plaintiffs. Because it does not expand the covered population. If the new accepted programs do increase the population that is potentially covered, although not as much as they would increase it if the requirements were not there, does it not then further the objectives of the statute by increasing the covered population, even though it didn't increase it as much as it could have? I don't believe the factual premise is a correct description. Both states, Kentucky and Arkansas, are ACA expansion states, so they elected, though they didn't have to, to amend their state plans in order to provide coverage to these newly eligible adults. That happened before. Arkansas did it in connection with a demonstration, but it still, it amended its state plan. It amended the state plan. It did. Just to be clear, under NFIB, states that choose to do that have the prerogative to change their mind, and that was important and explicitly an assurance that HHS gave back in 2012 when states were contemplating the extension. I'm still not sure I'm getting at what I'm trying to get at. Okay. The question I've got is, the programs that the government is challenging, I mean, the government is being challenged on today that the district court rules were invalid, do those programs actually result in an increase in the potentially covered population in that state or not? In the long term, the answer is hopefully yes. In the near term, if I'm understanding the question, that's not our argument, because I know it's the government's argument. Well, we are the government. Whoa. Okay. Excuse me. The government's argument seems, I'm sorry, the complainant's argument, I'll get my new parts of the program accepted by the government do not further the objectives of the statute because these work requirements cause a decrease rather than an increase in the people who are eligible. Now, if it's not the case that that works as a decrease, if the total is going to be greater than it was before, is not the objection by the complaining parties wrong? That's not our argument, because I don't think the court's factual premise is accurate, if I'm understanding it. What the plaintiffs would like is for the expansion population to be covered under the ACA with the benchmark plan with no additional conditions on eligibility, and that's what was happening before these demonstrations were approved. The reason that we've given, and that, of course, the Secretary's given, that these testing, these particular measures are likely to promote the coverage, expand coverage in the long term, is because Medicaid is a dynamic program in which an enormous amount of spending is optional. And so if states can find ways to make their programs more cost effective, and that can be either by helping people who can graduate onto the exchanges do so, or, to go back to Judge Pillar's question, by making it more cost effective while the participants are in the Medicaid program, that is what frees up scarce resources that can then be used for other people in need. And what is the, I just would like your help in pinning down, what is the hypothesis or the hypotheses that are being tested here? One of them, I gather, is whether the application of these requirements is going to transition people to commercial coverage? Yes. Another is whether the people who remain covered are going to have improved health as a result of work-oriented activities? Yes, but not exclusively. So also, I mean, there are 100 pages of special terms and conditions attached to the Kentucky Evaluation and Monitoring, and the application has a series of hypotheses, but I just don't want to forget about the premiums and the elimination of retroactive eligibility and the Kentucky My Rewards program. And these were parts of a broader program, many of which are meant to encourage increase in preventive services. Including, for example, the anti-retroactivity provision is, you know, sign up early rather than wait until you get sick. That is going to, and when, there's a lot of sort of vague language in the briefing and in the record about enhanced engagement with your health care. That's talking about those non-retroactivity provisions, right? Yes. It's not that you're going to, as having a work requirement is going to make you more engaged with your health care. No, the court is correct. That type of, it sounds like lingo, but this is the same theory that the, that HHS back in 2015 approved for the Indiana demonstration, comparable, you know, to some extent identical measures like premiums, elimination of retroactive eligibility. The idea. And those have not been sustained by a court, have they? Well, that's the new Indiana lawsuit that was just filed. And, I mean, if the court looks, this is a point I don't want lost, if the court looks at that complaint starting around paragraph 70, these were after extended negotiations with Indiana, this was the agreement that was reached that allowed Indiana, and Indiana chose to do the expansion because it was being also allowed to test these requirements. Now, I gather, though, that the government is not defending in this court that it is and serves the interests of Medicaid to increase in any degree the number of covered persons. And, therefore, the state's threat that unless this is approved, they will give up expansion gives them license basically to offer expansion on any grounds whatsoever. You're not defending on that. No, and to be clear, that is not what the Secretary said. And just to look at the facts, Arkansas, part of, although Arkansas is, the demonstration applies only to the expansion, and it requested, proposed to drop the eligibility from 133 percent at Federal poverty level to 100 percent, and HHS said no. So under, by no means are we suggesting it's a free-for-all just because the expansion was made optional by NFIB. But you claim they would not take the position that blackmail is a reason for voting. Well, to be clear, the Federal Government is not going to be easily forced to approve projects it doesn't want to approve. Here, these are, the Kentucky application was submitted in August 2016. These were years of back-and-forth and negotiations in which all sorts of additional qualifications were required of Kentucky before CMS gave that ultimate approval, even the first approval, and particularly meant to align with the TANF and SNAP programs. So the requirement that anyone exempted under TANF also has to be exempted from these work-oriented requirements. That was something that was added to the Kentucky demonstration at a fairly late stage, even after those July 2017 amendments. Can you tell me why, forgetting your position on reviewability, just assume I don't believe it? Yes, I'll assume. All right. Why Judge Bozberg's very thorough and careful analysis in very usual administrative law terms is not eminently correct, principally based on the Secretary's failure to consider the effects on coverage? He's alone enough. And your citing objectives, which he says, I think forcefully, are not objectives of the statute. So I think we first very much disagree with that premise. If I may explain. Let's start with helping people who are in the adult expansion population transition to the exchanges. You might wonder, why is the federal government here supporting that? Because that means instead of the joint federal-state financing of their health care, you've got massive federally funded subsidies for their health care. No, no, no, wait. He is saying, he's looking at data. He's saying you're not addressing the effects of the programs on coverage. The real effects, not hypothetical effects, the real effects. Well, and I gather you point to a sentence where the Secretary says health benefits outweigh coverage losses. And I, is that the only place? No, no. In the record where the Secretary addresses that question? No. You don't understand my question. I mean, he's making, it's a very long, thoughtful, thorough opinion. Bottom line, he's saying you're not addressing something that's critical in this case. The effects on coverage, and the effects on coverage are not hypothetical. So he is assuming that any projected reduction in coverage means bad coverage loss, as in people going without coverage. That's exactly what I'm trying to find out, I guess. The questions that I didn't make very clear. Excuse me. Go ahead. I just want to emphasize, from the start, and in the Kentucky application, is the objective of helping people get the education they need, the job training skills, it could be a GED, volunteer opportunities. It makes that objective of this statute. I mean, those are all laudable goals, but the question we have here is whether the acceptance furthers the goals of the statute. Okay, I see. The reason it furthers the goal is because, as this Court, in the Farmer v. Thompson opinion recognized, and Supreme Court in Farmer v. Walsh, and more generally in Doblino recognized, is if you can conserve what are finite state Medicaid resources by having people who don't need to get Medicaid get their coverage in a different way, that promotes the objectives of the Medicaid program. And part of the reason it does so, you have to understand that about 50 percent of state Medicaid spending is optional, optional populations. Let's assume that's arguably correct to some extent. What Judge Boasberg said is, there's data, there's real information, briefs on the other side pointed out, where there are adverse effects on the population coverage where people are dropping out. People are going to lose coverage because of the pilot. They're going to lose coverage, and what he is saying, importantly, is you haven't addressed that. Okay, if the Court is talking about the Parkinson… Let me make it very clear what Judge Centello is just saying, and you can't point to other objectives that are not statutory objectives and say, well, we've addressed them. And he, I think, very convincingly says, no, that's not an answer. The principal objective is coverage. The data shows people are leaving because of the pilot program, and you haven't explained it. You haven't addressed it. You haven't accounted for it. Okay, if the Court is referring to the Arkansas statistics, there were 17,000 people who temporarily lost coverage at the rollout of the Arkansas project. And this is important. I want to differentiate between, and act like I am in no way diminishing the significance of that. But the point of having state demonstrations is so that you identify that type of rollout issue at the local level where it can be fixed easily. And if the Court remembers the rollout of Medicare Part D in 2006, when you were supposed to have 6 million elderly Medicaid recipients transitioned to Medicare Part D, that was a fiasco, and it was not addressed that easily, and 20 states had to enact emergency legislation. So rollout problems are real, and they are, you know, a distinct category, and that is part of the reason for this demonstration. Isn't one of the requirements of an application that you have a demonstration evaluation instrument and details in place, and that you actually do estimate in a concrete way whether there will be losses in coverage? And I don't see those pieces in the record. Look, in Kentucky, to the extent the regulation, it's a post-ACA. There are regulations that require certain information in the application. Yes, we're talking about those. Section 431. Yeah. It does not apply to Arkansas because that was an amendment to an existing demonstration. In Kentucky, because it was a new demonstration, they did apply. And that is the budget neutrality worksheet that Judge Boasberg referenced in the opinion, but he misunderstood what it was saying, and he also overlooked changes that were made after the time of that projection. Misunderstood what it was saying in terms of the person hours rather than individuals or person months? More important, he assumed that any reduction in coverage meant people going without Medicaid as opposed to what, I'm going to read from, this is 5427 of the Kentucky administrative record, and this is the public notice that Kentucky put out at the same, simultaneous with that budget neutrality worksheet, and says, in later demonstration years, more participants are expected to transition to commercial coverage. As distinct from, like, you can imagine a program in which you can get a GED. That counts. That does not immediately transition you to commercial coverage. It might take another year of job skills training and another year of volunteer experience. These are over time hypotheses. Of course, there are no data because it hasn't been implemented yet, but they're hypotheses about what could happen if the TANF and SNAP type requirements are tested on populations that are materially comparable to the people who are already subject to them under TANF and SNAP. So you're pointing to the fiscal soundness of the program as an objective and saying that getting more people into the private market serves the program's objective. Is that right? Yes, because fiscal soundness, we don't just mean is it on the verge of collapse. We mean, the way the Supreme Court said in Justice Stevens' opinion in the Farmer versus Walsh, if you keep borderline populations out of Medicaid, that frees up resources that the state can then use. But Walsh and Thompson did not involve taking people that are eligible under the federal terms and cutting back and making them ineligible. Well, to be clear, these are not budget cuts. These are requirements, conditions, as under TANF and SNAP. TANF and SNAP, those are statutory conditions there. That is not comparable to this at all. That is why this is a demonstration. I mean, the demonstration authority is being used in order to test requirements that in Congress's judgment are reasonable means to help people get the skills they need to transition to financial independence. So when Congress had those goals in mind, it put those requirements in. But the goals of this statute that you're dealing with here, I'm not sure how you found that to be. So I'm going back to Judge Pillard. The principal goal on the ACA, we're all putting our heads in the sand if we don't be able to provide greater coverage. That was what was the principal goal, just as Judge Boothburg said. And the other things that you're saying may be laudable goals, but to have them outweigh what is obviously the principal goal of the statute seems a bit strange. Let me make it concrete, because we're not saying they outweigh the principal goal of the statute. We're saying that these are means of accomplishing the principal goal of the statute. So, again, think about the medically needy population for a moment. This is a massive, optional Medicaid population. It's what often allows elderly people in nursing homes to get Medicaid. What did you call them? Medically needy. Medically needy. Yes. This is, in Justice Stevens' the same opinion, he just explains. This is undisputed background. You've got the categorically needy, or also known as mandatory populations, and the medically needy, which was the big optional population and still is under Medicaid. So if you can come up with ways to shift people in the now optional ACA expansion population to the exchanges, that frees up more money that can be used. But that's mixing apples and oranges, isn't it? Right. Because the medically needy were optional in the sense that you can strive to give them some coverage, whereas here it's optional in more of an on-off switch. I thought you weren't relying on the notion that because the state can altogether refuse to cover the expansion population, that they can, you know, cover any fraction of that population. And once you buy that when you're in for the expansion, that is a mandatory population, then I'm not sure what your argument is. Well, actually, I'm not sure the premise is correct about the medically needy. But even if it were, again, this is going to what Justice Stevens pointed out in that Farmer v. Walsh opinion. Even with respect to mandatory services, like inpatient hospital days, states have huge discretion in deciding how to reimburse. And so Justice Stevens cited an example of Tennessee as a cost-cutting measure dropped the annual cap on inpatient hospital services from 20 days to 14 days. This is a mandatory service, and he's just illustrating the breadth of a state's discretion. And so if you free up money, there is no question that if you free up state Medicaid money, that opens the possibility of providing coverage, whether it's more services, services to more people. And that was the same theory that animated the decision in Farmer v. Walsh, which is that you could impose certain types of burdens on existing Medicaid recipients in order to get drug rebates for non-Medicaid people in the hope that that means those people won't become Medicaid recipients. I guess in Walsh, to me, the thing that's more closely speaking to the issue in this case is that the court says that the fact that the program there, the prescription benefit program, provides benefits to needy people and curtails Medicaid costs, would not provide a sufficient basis for upholding the program if it severely curtailed Medicaid recipients' access to prescription drugs. And here, by analogy, we have a proposal that the challengers are claiming does severely curtail Medicaid recipients' access, not just to one benefit, but to eligibility overall. So I just, I think there's some... Okay, so I just want to make sure. So we're in agreement now on ends that if these conditions can help to successfully transition people to the exchanges... I'm not sure we are. Well, the premise of the question is at least... The premise of the question, whether, if it causes a dramatic reduction, has the Secretary taken that into account? Yes. And this is where, when the Secretary keeps emphasizing that these conditions are designed to encourage compliance, and that they are crafted, tailored, like the TANF and SNAP requirements, to apply to those people who can reasonably be expected to meet them. So this is, again, it's a hypothesis. It's an experiment. There's not going to be evidence. But Congress's judgment, as reflected in those other statutes, is that for this population, it is reasonable to ask for 20 hours a week of the list of activities that is, you know, materially identical to the list we have here. It's actually more flexible under the Kentucky and Arkansas projects, but... If there were evidence that not watching television was, you know, made people healthier, could the Secretary say, we're going to do a demonstration project, and if you watch television, you're off, you know, more than six hours a week? You know, the correlation with health, I'm just not understanding. I want to turn back to that, but we just left objectives, and I just want to make sure that we have not left incomplete the point I was just making. I'm focusing right now not just on the healthier beneficiaries cost less for Medicaid programs, which I'm happy to address, but I want to talk about this very real... You know, you've got states here that have voluntarily chosen to participate in this expansion. You've got a number of states, like Virginia, in which the legislation authorizing the expansion was contingent on seeking a demonstration like this one. Montana also recently enacted legislation like that. And so I just don't, I don't want to give any short trip to the idea that these states are struggling to make sure that their expansions are on a sound financial footing, and a big part of that is if you've got the populations whom Congress has independently determined can be appropriately asked to do 20 hours a week of these activities in order, Congress's judgment, in order to help lift them out of the programs. Where is your best evidence in the record that that would happen? The best evidence supporting the hypothesis that imposing a work requirement with monthly reporting that will, you know, that this stick, you know, it used to be a voluntary program in Arkansas, but not, there wasn't the level of uptake that they wanted. And so they said, well, we're going to get better uptake and we're going to, you know, get people into great jobs with market insurance. Where is the evidence that this kind of stick is going to help and is even plausibly going to cause that effect? It is the same social science evidence that has persuaded Congress not only to leave in place the TANF and SNAP requirements, although they've been criticized, but to strengthen them in the 2000s. But Congress didn't put it here. Congress, your argument is proven against you, because if Congress put it where they thought it would work and didn't put it here, then Congress didn't think it would work here, did it? Congress chose to allow states to impose these requirements across the board as a matter of federal law in TANF and SNAP. Congress itself imposed it for... Well, for Medicaid in 1996, Congress gave states authority to end the Medicaid benefits for TANF recipients who do not comply with the work-related requirements in that statute. And stopped there. Yes. And we're not suggesting that the Secretary could, across the board, simply change Medicaid law and say there are now, like, the TANF and SNAP requirements for everyone. This is an explicit exercise of the 1115 Demonstration Project Authority that's intended to allow this type of innovation in the programs. And recall, we had 27 AFDC demonstrations. You're not answering to what Judge Pillard asked, which is what Judge Bozberg was resting his opinion on. You haven't addressed coverage in any way that judges, at least, can digest what you said and be satisfied that this is reasoned decision-making. That's what we're talking about. You're talking about hypotheses that are kind of up in the sky. Congress certainly didn't endorse them in the terms that you would like. And it's just an administrative law process. You've got to have reasoned decision-making. You're looking to objectives that are not in the statute, and you're failing to address, as he said, the critical statutory objective, which is coverage. Bottom line, and Judge Pillard just asked you again, and you haven't been able to answer it. I think we're maybe talking past each other, but Congress, in the separate programs, made a judgment that these requirements help people, help to break the cycle of poverty and lift them out of the welfare program. In the Medicaid context, how does that work? If you're talking about a demonstration project, if you get a roughly full-time minimum wage job, you graduate out of the expansion population onto the exchanges where you are eligible for very high federal subsidies. That is a good thing. This is, of course, a hypothesis, because it's a demonstration, and it hasn't been tested. So I want to address Your Honor's questions about health, but I know I have... On health, and again, this is addressed, these letters are the most comprehensive decision documents in the context of a demonstration project of all time. As Judge Friendly pointed out, there was no decision document in Aguayo, which is the seminal case on the 1115 Authority, but on health... I don't know what's in the record, but again, this is longstanding. Because the special terms and conditions are not established until the approval stage, there is routinely another period of time before the evaluation... The protocols have to be submitted and approved by CMS. That's not anew. I thought under the regulations that you point out apply to Kentucky, that there is a requirement of the demonstration evaluations, and the professor's brief, Amica's brief, is very much focused on that, and I just wanted to know whether they're considered as a case of experiment first, and evaluate maybe. So we address that, it's in the footnote, because it wasn't an argument made by the plaintiffs, and we're just making the point that this is routine. This is not a new practice. This being, until Kentucky has the special terms and conditions, which is what it gets as approval, it really can't design the entire evaluation protocol, because that's supposed to be concordant with the terms and conditions. It's not a new practice. Yes, because it was not raised by the plaintiffs, it was raised by Amica's. I actually try very hard not to use footnotes, but I was differentiating between arguments that were presented by the party, and addressed by Amica's. And so again, on health, and just making a point, these requirements such as premiums, waivers of retroactive eligibility, as in the previous administration, are designed to provide incentives for greater uptake of preventive health services, which are very, very low among the expansion adults, so notwithstanding all the money that's being spent, you're not seeing dramatic improvement in the health. And just to close the loop, if the health of Medicaid recipients improves, that makes the Medicaid programs much more cost effective, because they're less costly to care for. Just one last question. Are you relying, and to what extent, and I thought it was a main feature of the underlying documentation, but your approach today makes me question, are you relying on the notion that work, or the work substitutes, in fact, make people healthier? Yes, and to be clear, what the Secretary said is correlate with improved health. Yes, well, be careful not to overstate, this is a hypothesis, and the literature establishes correlation. It is very difficult in this area to prove causation. But again, to be clear, this is, it would be hard to prove that premiums cause greater investment in your health care, health consumption, and that they cause increases in preventive services. Though nonetheless, this, and I realize the plaintiffs are challenging the last administration's approval of the Indiana plan now, but this is not a new concept, it's a familiar concept, and it's certainly a hypothesis that can be tested in the context of a demonstration. And I think the question, the main grommet of their case is at what expense in terms of coverage. Yes. Thank you. Good morning, Mr. Grisham. Good morning, Your Honors. May it please the Court. As part of a purported experiment to promote the objectives of Medicaid, the Secretary has, for the first time in the history of the Act, approved a combination of eligibility restrictions, penalty provisions, and benefit reductions that collectively will deny both health care and health benefits to the public. This is an experiment that will deny health coverage and access to care to hundreds of thousands of Medicaid recipients. Judge Boasberg was to correct, was correct to conclude that these approvals were arbitrary and capricious, and for at least three reasons, which I'd like to get at first. First, and most important, as Judge Edward noted, completely absent from the Secretary's analysis is any serious assessment of the massive impact on those who will lose coverage and be denied access to care as a result of these experiments. The purpose of Medicaid is to furnish medical assistance to those who are needy, and these experiments do precisely the opposite. Second, the analysis the Secretary did provide cannot carry the day. The Secretary invoked goals such as increasing upward mobility, reducing dependence on public assistance, and easing the transition to commercial coverage that are nowhere to be found in the Medicaid statute. And to the extent he sought to address other goals, such as improving health and cutting costs, he did so only by reducing the burden on the public. He did so by reducing medical assistance, not by furnishing it. And third, this was all part of an effort to transform and restructure Medicaid. That's what Kentucky said it was doing, that's what the Administrator said she was doing, and that's what the Secretary said he was doing when he approved cookie-cutter waivers that have effectively made work requirements available nationwide. But transforming and restructuring Medicaid to make it more like SNAP and TANF, or otherwise, is for Congress through legislation, not for the Secretary. It's necessary through administrative action. So let me start with what Judge Edwards was pointing to, which, of course, is what Judge Boasberg was pointing to, primarily, which is the failure of the government to address at all the stated goal of the Act, which is to furnish assistance. The government, the Secretary, nowhere addressed in its opening January letter the effect on coverage loss, even though it was obvious from the face of the document, even though commenters suggested there would be massive coverage loss, even though Kentucky acknowledged that. The government itself estimated coverage losses approaching 100,000, which we think substantially underestimates, and by the time the final Kentucky approval happened, even though 20% of the recipients in Arkansas had been kicked off Medicaid as a result of the experiment, in those circumstances, to not address the coverage loss, which is the principal purpose of Medicaid, renders the Secretary's approval arbitrary and capricious. It's simply a failure to address a substantial part of the problem under settled Medicaid law. Now, when the Secretary was actually asked by, after Judge Boasberg's first opinion, to address coverage loss, I'm sort of confused, actually, as to what the government's position is today as to Judge Sentel's blackmail question. When you look at what the Secretary said about coverage loss, as opposed to what the government is saying today, what the Secretary said, and this was on page 12 of the approval letter, under the recommendation of the Secretary, is that the government's position is that coverage loss should be addressed. In response to coverage loss, Kentucky has repeatedly made clear that its continued expansion of coverage, the ACA expansion population, is conditioned on implementation of this demonstration. It said it over and over. I don't want to bore the Court, but if you look at that, like six or seven times, it points to the 450,000 people who would be denied coverage. That's the blackmail argument. That's the sustainability argument. That's what the Secretary based the approval on when Judge Boasberg asked him to explain. Now, maybe the government is disavowing that, although I think you heard today that actually the sustainability of providing services to that expansion population is still at issue. So let me just address it briefly. That kind of blackmail theory cannot be a justification here. First of all, we disagree with the government that it's lawful. We don't ask this Court to decide that now, but both as a matter of federal law and as a matter of Kentucky law. Kentucky statute cited in our brief says it's the policy of the Commonwealth to take advantage of all federal funds that may be available for medical assistance. And so it's not clear to us that it's lawful at all. But even setting that aside, there is, of course, no limiting principle to that. It's not just that there's an expansion population. Of course, Medicaid itself is voluntary. And so if you believe the government, all a state needs to do is say, well, we're going to drop out of Medicaid. And then anything that the state does increases coverage because it gets a little cheaper. But there's a little bit about their position today, which is more, I think, along the lines of, you know, we can't afford to do the expansion, to accept the expansion population if we don't belt tighten a lot. And the way we've chosen to do that is to hasten people who can work into work for all kinds of reasons. You know, all kinds of policy reasons that are concordant with what's being done under PRAWRA, TANF. And, you know, we want people to be financially self-sufficient. And so that's a way that we are going to be able to afford our 10 percent and provide coverage for others. So I have a number of responses. So the first one, I think, goes back to the colloquy between Ms. Klein and Judge Santel. Just as a factual premise, and I think what she was saying is what we agree with, there is no attempt to condition the expansion population on this demonstration project. Kentucky has expanded. These people are getting coverage. It has been the coverage rate, the uninsured rate in Kentucky has dropped to 11 percent. These people, 450,000 people, are getting coverage. So this is not conditioned. But I understand that doesn't get to the core of Your Honor's question. So the core of Your Honor's question is, I think, there are two principal answers. First, that cutting costs by reducing coverage is not an acceptable goal. Their view is we're not cutting costs by reducing coverage. We would be thrilled if 100 percent of people subject to these requirements complied with that. And some of them would graduate into jobs and eventually on to keeping their Medicaid coverage for a long time. So while they're in school, while they're in jobs that don't have, and then they graduate up, some of the people will show that they don't have an obligation. They'd be thrilled if everybody did that. So a couple of things. So first of all, just to step back before I answer Your Honor's question directly, what Judge Bosberg said, and picking up on Judge Edwards' point, that may be fine, but in implementing that, we don't think it's fine. But even if you thought that was fine, you can't implement that without considering the massive coverage loss that might result. And there is no consideration of that that's a substantial part of the problem. But second, I do think, Your Honor, that a couple of responses are critical. First of all, as Your Honor pointed out, the passage in Walsh that the government relies on for this idea that somehow making things more cost-efficient and improving beneficiaries' lives, it misses the real point in Walsh, which is at pages 664 and 665, as Your Honor quoted, that curtailing costs is not a sufficient basis for upholding the program if severely curtailed Medicaid recipients' access to the drugs there. This Court said the same thing in the Pharma v. Thompson case. And of course, that's the basis of the Ninth Circuit's decisions in Newton Nations and Bino, right? These kinds of issues have been addressed by the courts, and it's precisely to the contrary to the government. In fact, it's mystifying to me that they think Walsh helps them rather than hurts them. I guess I would also say, Your Honor, that to the extent the government is making an effort to justify, well, let me step back, in addition to that, I think it really is a fundamental change in the way Medicaid is being given. What Medicaid is, from Congress's perspective, is it's a deal, right? Congress gives a huge chunk of money to the states, and in return, the states have to cover certain populations and provide certain floor of benefits. Now, there's a lot of flexibility, but Congress gives a floor. It's not up to the states to say, well, we'd like to cover some things and not other, we'd like to cover some people and not other. That kind of a la carte approach to Medicaid is not the deal that Congress has provided. I will also say that targeting this particular population, the ACA population, I think should give the courts some pause. Remember, this is a population that the government is currently providing 93 percent of the money to. If this population were to be taken off, right, the health problems still remain, and the costs still remain, and yet 93 percent of the funds to pay for that has disappeared. And so I think there's a real skepticism that one might have, and of course here the skepticism is very clear. There's a reason, not only should there be reason for skepticism, but actually the statements of the secretary and the governor and the administrator all make clear actually what's going on, is that this is an effort to impose work requirements. And indeed, Ms. Klein was pretty candid about that today, right? What the government thinks it's doing is exactly what the government purported to do, did, in the program that was at issue in Aguayo. But Aguayo is a million miles from here, and Judge Friendly's opinion makes that clear. Of course, the purpose of AFDC was not to furnish medical assistance, as here, but it was to attain or retain the capability for the maximum self-support and personal independence, consistent with the maintenance of continuing parental care. Judge Friendly... What about the resonant language in the Medicaid Act, which the secretary points to, about improving people's independence? Yeah, so I noticed that the government didn't mention that this morning, and I would say with pretty good reason. The actual sentence that Your Honor points to, 1396-1-2, says, rehabilitation and other services to help families and individuals attain or retain capability for independence or self-care. It seems very clear to me, and Judge Boasberg agreed, that that's talking about physical independence. It's rehabilitation services, self-care. It's not talking about support, and if I could just continue the Aguayo difference, because I think it's really critical. I mean, the government really is trying to blur SNAP and TANF in AFDC on the one hand, and Medicaid on the other. What Judge Friendly said was not only is the purpose difference, but from the very beginning, from the 1930s, there were work training programs that were similar to the things that the government was doing. In the late, in the 60s, there was a work incentive program that had been put into AFDC, and he looked at the legislative history and saw the same thing. So Judge Friendly said, these things are all in the Act. They're the purpose of the Act. Congress has enacted statutes that do it. It's precisely the opposite here. It seems to me that the analogy to Aguayo is the problem, not the solution. What about the one provision that Ms. Klein mentioned, which does authorize states to, in exact language, is something about the consistency between TANF and SNAP, and that one of the courses that a state can have is if it's cutting people for failure to work, off of those programs, it can also cut their Medicaid. Right, 1396 U1B3. Yes, Your Honor, so that is the only provision that they say, and what that is, is a provision that says, if you already are losing your public assistance benefits for failing to work under TANF, you can also lose your Medicaid benefits. But remember, that was enacted at the same time, and this goes to something Judge Chantel was talking about, that was enacted at the same time as the work requirements were added to SNAP, and the purpose was changed. And yet, that was the very time that Congress decided not to add those to Medicaid. As a categorical matter, but she's relying on that as support for the notion that it's not inconsistent with the Medicaid program to impose a work requirement, or to terminate coverage for failure to comply with a work requirement, so why not, I mean, of course they shouldn't have to do it as a statutory matter without some regulatorily authorized demonstration. And our response to that, Your Honor, is that that provision cannot plausibly be read to completely and fundamentally change the purposes of Medicaid. It's the classic elephants and mouse holes kind of problem. When it was passed as part of a package where Congress knew expressly how to put in the language about making financial independence and work requirements part of the act, and Congress did that in related statutes, it seems to me a much more sensible interpretation of the acts as a whole to recognize this as a... But I think all she's relying on it for is that it is a permissible purpose, not that Congress is directing one way or the other that it be done, which leads me to a related question, which is, what's your position on the level of deference to the Secretary in defining what the permissible purpose is? So I think, so I guess I would say this, Your Honor. So I don't think it's fair to read that provision, which is a, you know, as I say, it's a minor administrative provision that was put in at the same time Congress refused more broadly to change the purposes, to change the purposes. And has any State used that? I don't know the answer to that question, Your Honor. I don't know. I don't know the answer. I thought you... Oh, go ahead. I'm sorry. Finish. I'm sorry, Your Honor. I forgot the second part of your question. The deference to the Secretary. Oh, the deference to the Secretary. Yes. So I think, we think that the Secretary overall is really trying to fundamentally change the act in a critical way, and so we actually are dubious that overall the imposition of work requirements is something that would receive Chevron deference. Regardless of what, you know, whether this deference would extend to what the purposes of the act are, we think is a closer question. I think, I guess we come out with basically where Judge Boasberg was, which is to say that we think that promoting financial independence, upward mobility, getting people off public assistance is fundamentally not the purpose of Medicaid, and that it would, even if Chevron applied, it would violate Chevron at step one for the court to... Well, fundamentally, you were saying that work requirement may or may not be permissible in this context, but what Judge Boasberg said is, using administrative law principles, it can't be acceptable if you do not address coverage law.  We don't even have to get to the courts. It could be possible. So this is not about whether work requirements are absolutely impermissible, it's that you have put something in place without addressing the principle requirement of the statute, which is coverage. That's exactly right, Your Honor. And so regardless of what we, yes, that is the answer. It is a critical part of the problem, and Judge Boasberg recognized that. In direct response to Judge Fuller's question, which I agree you don't have to reach, we do think that promoting financial independence is not a goal of the act, and with respect to health, improving health and cutting costs, we think Judge Boasberg had it right, which is to say that if your method, and this relates to Judge Edwards' point, if your method for doing so is by cutting coverage, not by adding to coverage and furnishing coverage, then that is not an acceptable means. In other words, Congress is able to specify not only the purposes and the goals, but also the means for the, the means to the end. So in your view, these sort of My Benefits accounts and premium-based incentives to exercise, to eat better, to do better preventative care with your diabetes or your, you know, smoking cessation, all of those sort of efforts to give incentives might be permissible, but that conditioning your eligibility for the program on whether you do or don't pursue those, I think, indisputably health-promoting objectives, would be impermissible? I'm sorry. We, yes, exactly. That's exactly right, that conditioning it on benefits would make it impermissible, and indeed, you know, not only was, does it go to your Honor's earlier hypo about TV watching, and Judge Boasberg talked about broccoli and others, but actually the provision the government sites in DC. Correct, Your Honor. I should premise all of my answers. Absolutely right, Your Honor. I should premise all of my answers. I'm getting questions. I want to answer them directly. But if I could put in an implied, an implied preview to a prologue to every answer where I say you don't need to reach that, because coverage, coverage is the focus of the act, and as Judge Roseberg said, the government never wrestled with coverage at all, and with the exception of this blackmail theory. If you would, if I could have that as a standing objection, that's all the court needs to decide, and all the court really should decide here. If I could just finish the answer to Judge Pillard, the government points to 4108, which is this grant-making in the ACA, which the government says, look, it promotes all this healthy behavior, but what's critical to us is 4108E, which says none of this can affect your eligibility for benefits, or the level of benefits you receive. And so it's precisely, I think, reinforces our point that sure, health might be a part in some circumstances, but Congress specified a means as well as an end, and just as Judge Roseberg said, you know, that's what, that's what was going on with Congress. And Judge Roseberg pointed out, you know, the Joe and Dan hypothetical with the ACA. You know, I think that really does go to the core of what was going on here. Do you agree with, I mean, I'm going to oversimplify, perhaps unfairly, his view, but that health is not a permissible aim of Medicare? Judge Roseberg's conclusion that health itself, pursuit of health, qua health, is not a permissible aim of Medicare. So I think you have, I think I would say that, correct, that health independent of coverage is not a critical aim. Again, with that hypothesis that you don't have to decide that. There's nothing in that statute that says we're trying to help people be more healthy. It says we're trying to give people coverage for medical care. Exactly. And I think that's what Judge, I know that's what, I think that's what Judge Roseberg was saying. We agree with that. You know, it is health through a mechanism. And so you, the Secretary cannot say, I am looking to improve health by conditioning Medicaid eligibility on no television, on eating broccoli, on doing Pilates, or any of those other things that Congress was interested in furnishing coverage. And to say I want to improve health at the expense of coverage is, or, you know, independent of coverage is really not one of the purposes of the Act at all. And are you challenging the failure to have this demonstration evaluation in place, or what's your position on that? So we have not independently raised that here. So we do think that for a number of reasons this isn't a legitimate experiment in any sort of way, shape, or form. You know, there, this is now effectively, it's available nationwide. There are, I think, ten states that have gotten approvals and another seven waiting in the wings. You know, there isn't the kind of rigor that you would expect, particularly, I know the Court understands this, but, you know, we're talking about real people losing real coverage with real health problems. And those are in the record and I think are obvious to all. And the idea that this is an experiment without the kind of, you know, rigor at the front end that one would expect is concerning. But we have not, and Kander and Your Honor knows in our briefs, that we have not independently identified that. We've rested, identified that as a freestanding, arbitrary, and capricious APA problem. We've relied on Judge Boasberg's approach. Thank you, Your Honor. Thank you. Does Ms. Kline have rebuttal time? You may have two minutes. I'd like to just start with Judge Edwards' question about where in the record the Secretary weighed the upside, the potential to increase coverage against the risk of coverage loss. So, for example, on the Kentucky Administrative Record, this is the decision document at 6731. The Secretary recognized that if you, to create an effective incentive to take these actions, states may attach penalties for failure to take the measures. And this may mean beneficiaries who fail to comply will lose Medicaid coverage, at least temporarily. However, the incentives included in the demonstration are not designed to encourage this result. Rather, they are intended to incorporate achievable conditions of continued coverage, and any loss of coverage that is the result of noncompliance must be weighed against the benefits Kentucky hopes to achieve. Through the demonstration project, including both improved health and independence of the beneficiaries who comply, and the Commonwealth's enhanced ability to stretch its Medicaid resources and maintain the fiscal sustainability of the program. And the evaluation, like, you want to know, like, how does the Secretary make that judgment, and why isn't it quantitative? It's qualitative. It's because unlike in Benno v. Shalala, where the so-called work incentive was being placed on children, on persons found disabled within the meaning of the Social Security benefits, so unable to work, here the work incentives are being placed on a population that can be reasonably expected to succeed. So this is, because this is a demonstration, it is entirely permissible for the agency to look at the soundness of the design, at the qualitative measures, and it does not require it to be broken down in some quantitative fashion, which, honestly, if the agency had tried to do so, I think the other side would be saying that's speculative, to which we'd be saying, of course it's speculative, we haven't done it yet. The fact that the agency did not weigh is inaccurate. So as I was probing Mr. Gershengorn, you would agree with the notion that the Secretary would be thrilled if everybody complied, dearly hopes everyone will comply. Do you have tripwires or numbers of people cut off, or a time period where you're going to say, wait a minute, this is just beyond what we expected, and we can't have people not covered for this, you know, because it's monthly, that you have to report, people are just not getting their act together? Yes, both formally, the letters, the Secretary routinely reserves the authority to basically say we're pulling back, we're changing our mind. I'm wondering how realistic, I know it's a very political negotiating process between the federal government and the states, are there lines that the states can't cross in coverage loss? In practice, if you look at the most recent, Judge Boasberg's opinion in New Hampshire, what you will see is that New Hampshire, on its own, concerned that its outreach wasn't working, that it wasn't getting the reports, delayed any disenrollment. Remember, these are states that want to provide coverage to eligible people, because if they don't, think of what happens, they just end up in the emergency room. It's much, much better for these people to have health insurance, whether it be from Medicaid or through the exchanges or employer, and these are states that have chosen to expand and are, you know, come January 1st, are going to have to pay 20, 10 percent of the claims costs and are trying to just figure out what ways can we do it that are more economical, that are more sound. And, you know, that's what boils down to is 1115 gives the Secretary broad authority when, in his judgment, a demonstration will promote the purposes of the statute, and though Congress tinkered with that language when it amended it in the ACA, quite notably did not impose new substantive constraints. They're all transparency and reporting requirements. Thank you.
judges: Pillard, Edwards, Sentelle